IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HOWARD SCOTT GREGORY**, | : | CIVIL NO. 1:16-CV-966 |
| **Plaintiff** | : | (Chief Judge Conner) |
| v. | : | |
| **UNITED STATES OF AMERICA**, | : | |
| **Defendant** | : | |

## MEMORANDUM

On May 17, 2016, plaintiff Howard Scott Gregory ("Gregory"), an inmate formerly housed at the Federal Correctional Institution at Allenwood, Pennsylvania ("FCI-Allenwood"), commenced this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq.* (Doc. 1). Named as the sole defendant is the United States.[1] Presently before the court is the United States' motion (Doc. 16) to dismiss pursuant to Federal Rule of Civil Procedure 12(b) or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below, the court will deny the motion.

---

[1] The complaint initially named the Federal Bureau of Prisons as the sole defendant. Gregory subsequently filed a motion (Doc. 21) to substitute the United States as the defendant in this matter. On September 19, 2016, the court granted Gregory's motion and substituted the United States as the sole defendant in this action. (Doc. 24). In the instant dispositive motion, defendant seeks dismissal of the Federal Bureau of Prisons as an improper defendant in an action brought under the FTCA. In light of the court's September 19, 2016 order, defendant's request to dismiss the BOP is moot and will not be addressed herein.

I.   **Summary Judgment Standard of Review**

Through summary adjudication the court may dispose of those claims that do not present a "genuine issue as to any material fact" and for which a jury trial would be an empty and unnecessary formality. See FED. R. CIV. P. 56(a). The burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F.Supp.2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also FED. R. CIV. P. 56(a), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F.Supp.2d at 315. Gregory filed a counter statement of material facts; however, this counter statement fails to reference parts of the record that support his denials and statements in violation of L.R. 56.1.[2]

II.   **Statement of Material Facts**

Gregory was designated to FCI-Allenwood on October 14, 2014. (Doc. 20, Statement of Material Facts, ¶ 1). When Gregory arrived at FCI-Allenwood, he had a low bunk pass that was previously issued in June 2014. (Doc. 20 at ¶ 2 n. 1).

---

[2] Moreover, Gregory did not respond to defendant's statements numbered 1-2, 14-18, and 32-33. See (Doc. 27). The court will therefore deem those facts to be admitted. See M.D. Pa. L.R. 56.1.

Therefore, FCI-Allenwood officials assigned Gregory to a low bunk due to his history of seizures.  (Doc. 20 at ¶ 2; Doc. 20-1 at 7; Doc. 27 at ¶ 2).

In January 2015, Gregory was transferred to the Special Housing Unit ("SHU") and assigned to the upper bunk in cell 317.  (Doc. 20 at ¶¶ 5, 19; Doc. 20-1 at 23, Inmate History Quarters).  On January 21, 2015, Gregory allegedly suffered a seizure, fell from the top bunk, and sustained injuries.  (Doc. 1 at 7; Doc. 20 at ¶¶ 6, 19).

Timothy Pfirman is a physician assistant at FCI-Allenwood and is assigned to the SHU.  (Doc. 20 ¶ 3; Doc. 20-1 at 5-6, Declaration of Timothy Pfirman, P.A. ("Pfirman Decl."), ¶ 1-2).  As part of his duties, Pfirman makes daily rounds to check on the SHU inmates.  (Doc. 20 at ¶ 4; Pfirman Decl. ¶ 2).  The parties dispute whether Gregory ever advised Pfirman that he was supposed to be assigned to a lower bunk.  (Doc. 20 at ¶ 6; Pfirman Decl. ¶ 10; Doc. 27).  Pfirman declares that inmates in the SHU are generally quick to advise him that they have a low bunk pass, and Gregory never informed him that he had a low bunk pass.  (Doc. 20 at ¶ 7; Pfirman Decl. ¶ 11).  Subsequent to the alleged fall, Gregory reported to Pfirman that he "got up to urinate" and he "next remembers lying on the floor in pain." (Doc. 20 at ¶ 20; Pfirman Decl. ¶ 6; Doc. 27 at ¶¶ 19-22).  Pfirman does not recall a report from Gregory that he suffered a seizure prior to the fall, and the alleged fall was unwitnessed and unverified.  (Doc. 20 at ¶¶ 20-21; Pfirman Decl. ¶¶ 7, 9).

Elizabete Stahl is a clinical director for the BOP and is assigned to the Federal Correctional Complex at Allenwood.  (Doc. 20-1 at 8-10, Declaration of

Elizabete Stahl, D.O., F.A.C.P. ("Stahl Decl."), ¶ 1). Stahl declares that while Gregory was at FCI-Allenwood, he was prescribed the appropriate medication to treat and prevent seizures, specifically, Phenytoin and Levetriracetam. (Doc. 20 at ¶ 8; Stahl Decl. ¶ 5). Prior to December 2014, Gregory was permitted to "self-carry" his seizure medication. (Doc. 20 at ¶ 9; Stahl Decl. ¶ 6). On November 17, 2014, Gregory had routine blood work, which showed low levels for Phenytoin. (Doc. 20 at ¶ 10; Stahl Decl. ¶ 7). Stahl opines that the only explanation for such a low level would be that Gregory was not taking his medication as prescribed. (Doc. 20 at ¶ 12; Stahl Decl. ¶ 9). However, according to the pharmacy records, Gregory was picking up his seizure medication. (Doc. 20 at ¶ 11; Stahl Decl. ¶ 8). Because Stahl believed there was no rational explanation for his level to be so low, she ordered that Gregory be monitored to ensure that he was actually taking his seizure medication as prescribed. (Doc. 20 at ¶ 13; Stahl Decl. ¶ 10). On several occasions in December 2014, Gregory did not show up to pill line for his medication. (Doc. 20 at ¶ 14; Stahl Decl. ¶ 11; Doc. 20-1 at 19-20). The Medication Administration record shows that during January 2015 Gregory either did not show up for his seizure medication, or refused to take his seizure medication. (Doc. 20 at ¶ 15; Stahl Decl. ¶ 12; Doc. 20-1 at 19-20). Specifically, the few days prior to Gregory's seizure, including January 21, 2015, Gregory refused to take his seizure medication. (Doc. 20 at ¶ 16; Stahl Decl. ¶ 13). The day after Gregory's alleged seizure, he took a morning dose of his seizure medication. (Doc. 20 at ¶ 17; Stahl Decl. ¶ 14). While

Gregory was on pill-line, he was advised of the importance of taking his seizure medication. (Doc. 20 at ¶ 18; Stahl Decl. ¶ 15).

Immediately following the alleged fall on January 21, 2015, Gregory reported to Health Services and the following summary was documented:

> [Gregory] fell out of bunk at approximately 0400 this morning. He is not sure what happened. He states that [he] got up to urinate and the next thing he remembers is laying o[n] the floor in pain. He is c/o pain above L eye, posterior neck, and middle back. He also has a pins and needles feeling down the R shoulder and arm to the elbow. He does have mild h/a and nausea. He denies dizziness, vision changes, swelling, numbness, or urine or stool incontinence.

(Doc. 20 at ¶ 22; Doc. 20-1 at 25, BOP Health Services Clinical Encounter).

Gregory was thereafter transported by ambulance to the Williamsport Regional Medical Center. (Doc. 20 at ¶ 23; Stahl Decl. ¶ 19; Doc. 20-1 at 28; Doc. 27 at ¶¶ 23-28). Gregory complained of chest, right shoulder, neck, head, and back injuries. (Stahl Decl. ¶ 20; Doc. 20-1 at 28-41). After reviewing chest radiographs, the emergency room doctor, Brian Connolly, M.D., noted, "[t]he cardiomediastinal silhouette is within normal limits. There is no airspace consolidation, vascular congestion, pleural effusion or pneumothorax. Normal chest radiographs." (Doc. 20 at ¶ 24; Stahl Decl. ¶ 21; Doc. 20-1 at 29). Dr. Connolly reviewed x-rays of Gregory's right shoulder and did not note any injury. (Doc. 20 at ¶ 25; Stahl Decl. ¶ 22; Doc. 20-1 at 30). His findings were as follows: "[t]here is no fracture or dislocation. There is no evidence of joint effusion. The soft tissues are unremarkable. No acute bony abnormality."

Dr. Connolly reviewed a CT of Gregory's cervical spine and noted the following:

> There is straightening of the normal cervical lordosis which can be secondary to positioning versus spasm.  Small anterior osteophyte inferior to the C5 and plate.  The prevertebral soft tissue is within normal limits.  No evidence of an acute fracture or subluxation.

(Doc. 20 at ¶ 26; Stahl Decl. ¶ 23; Doc. 20-1 at 31).

Dr. Connolly reviewed a CT scan of Gregory's head.  (Doc. 20 at ¶ 27; Stahl Decl. ¶ 24; Doc. 20-1 at 32).  He did not note any injury, and instead noted:

> The ventricles and sulci are within normal limits.  There is no evidence for an acute intracranial hemorrhage, midline shift, or mass effect.  The gray/white differential is maintained.  The posterior fossa structures are unremarkable.  The paranasal sinuses and mastoid aircells are clear.

(Doc. 20 at ¶ 27; Stahl Decl. ¶ 24; Doc. 20-1 at 32).

Dr. Connolly reviewed a CT of Gregory's thoracic spine.  (Doc. 20 at ¶ 28; Stahl Decl. ¶ 25; Doc. 20-1 at 33).  Dr. Connolly's interpretation was as follows:

> There is normal alignment of the thoracic spine.  Multilevel Schmorl's nodes were noted. Anterior osteophyte noted at the T10-11 level.  There is a well corticated osseous density superior to the T8 spinal process best seen on sagittal image 22.  This likely represents an osteophyte.  No evidence of an acute fracture or subluxation.

(Doc. 20 at ¶ 28; Stahl Decl. ¶ 25; Doc. 20-1 at 33).

Upon Gregory's discharge from the emergency room, he received an exit form which indicated that he was evaluated for neck pain, the CT scan did not show any fractures, but it may be too early to detect any fractures.  (Doc. 20-1 at 38).  Gregory admits that he did not suffer any broken bones after the fall; rather, he maintains that he required an MRI to reveal his injuries.  (Doc. 27 at ¶¶ 23-28).

On November 20, 2015, Gregory was treated by Health Services for a follow up visit. (Doc. 20 at ¶ 29; Doc. 20-1 at 52, BOP Health Services Clinical Encounter). The following was documented:

> [Gregory] presents for mental health, seizure, and gallbladder f/u…. Note that this I/m had multiple tests done to evaluate his neck pain and neuropathy. Inconsistences were noted between test results and the amount of pain the I/m was claiming. I/M has been approved for cholecystectomy but surgeon would not perform procedure until I/m is compliant with seizure medication.

(Id.)

A follow up visit was scheduled for December 23, 2015, with a notation to "[c]heck compliance of seizure meds and consider resubmit for cholecystectomy." (Doc. 20 at ¶ 30; Doc. 20-1 at 53).

Gregory ostensibly acknowledges that he was not taking his seizure medication as prescribed, stating, "I believe Phentoin gave me a dirty urin[e], which placed me in SHU. Other people have been locked up for the same. I am still fighting my incident report. So yes at the time I told the surge[o]n and nurse that I haven't been taking my medication for 8 days." (Doc. 27 at 2, ¶¶ 29-31).

On May 20, 2015, Gregory filed Administrative Tort Claim No. TRT-NER-2015-04151, seeking $75,000, in damages for the injuries he allegedly sustained when he suffered a seizure and fell from the top bunk at FCI-Allenwood on January 21, 2015. (Doc. 20 ¶ 32; Doc. 20-1 at 54). The government's response states as follows:

> Your Administrative Claim No. TRT-NER-2015-04151, properly received on May 20, 2015, has been considered for settlement as provided by the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2672, under authority delegated to me by 28 C.F.R. § 543.30. Damages are sought in the amount of $75,000.00 based on a personal injury claim.

>Specifically, you allege you continue to suffer injuries resulting from a seizure and fall from the upper bunk at FCI Allenwood on January 21, 2015, after the SHU staff failed to adhere to your lower bunk pass[.]
>
>An investigation, including review of your medical records, shows you have not provided sufficient evidence to substantiate the allegations of this claim.  There is no evidence that you experienced a compensable loss as the result of negligence on the part of any Bureau of Prisons employee.  Accordingly, your claim is denied.
>
>If you are dissatisfied with this decision, you may bring an action against the United States in an appropriate United States District Court within six (6) month of the date of this memorandum.

(Doc. 20-1 at 54).

On February 29, 2016, Gregory was transferred out of FCI-Allenwood.  (Doc. 20 at ¶ 31; Stahl Decl. ¶ 26; Doc. 20-1 at 11).

### III.  Discussion

Under the FTCA, sovereign immunity has been waived, in limited circumstances, for claims for money damages against the United States for injury or loss of property caused by the negligent or wrongful act or omission of a federal employee.  28 U.S.C. § 2671, *et seq.*  A person may sue under the FTCA to recover damages from the United States for personal injuries sustained during confinement in a federal prison by reason of the negligence of a government employee.  United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

In considering an FTCA claim, the law of the place where an act or omission occurs is to be applied.  28 U.S.C. § 1346(b).  Because FCI-Allenwood is in Pennsylvania, Pennsylvania law applies.  Under Pennsylvania law, a plaintiff must prove the following elements to establish a prima facie claim for negligence: "(1) the defendant had a duty to conform to a certain standard of conduct; (2) the defendant

8

breached that duty; (3) such breach caused the harm in question; and (4) the plaintiff incurred actual loss or damage." Krentz v. Consol. Rail Corp., 589 Pa. 576, 910 A.2d 20, 27 (Pa. 2006).  In cases that involve federal prisoners, it has been recognized that the government's duty of care is one of ordinary diligence, meaning that the United States must "exercise reasonable care and diligence to protect the prisoner from danger, known to or which might reasonably be apprehended by him."  See 18 U.S.C. § 4042; Turner v. Miller, 679 F.Supp. 441, 443 (M.D. Pa. 1987).

In the matter *sub judice*, Gregory claims that the prison officials were negligent in assigning him to a top bunk in the SHU at FCI-Allenwood.  The United States argues that Gregory cannot make the requisite showing to establish a prima facie negligence claim.  (Doc. 19 at 8-14).

The United States' duty of care is one of ordinary diligence.  See 18 U.S.C. § 4042.  The United States does not dispute that a lower bunk pass was issued to Gregory in June 2014 at a previous institution, he arrived at FCI-Allenwood with the lower bunk pass, and his lower bunk pass was entered into the BOP's electronic records.  (Doc. 19 at 9-10).  The record confirms that Gregory was issued a low bunk pass in June 2014.  (Doc. 1 at 11-12; Doc. 20-1 at 7, 15).  The BOP Inmate History Quarters log reveals that Gregory was assigned to lower bunks from his arrival at FCI-Allenwood through January 5, 2015.  (Doc. 20-1 at 23).  However, the record shows that when Gregory was placed in the SHU, he was assigned to an upper bunk.  (Id.)  The United States maintains that Gregory never informed Pfirman that he had a lower bunk pass, and thus they did not breach any duty owed to Gregory.  (Doc. 20 at ¶ 6).  In response to defendant's position that Gregory never informed

9

Pfirman about his lower bunk pass, Gregory states, *inter alia*, that he "constantly" told Pfirman, and other prison officials, that he had a lower bunk pass. (Doc. 1 at 3-7; Doc. 27 at 3). The court finds that there is a question of material fact as to whether Gregory advised prison staff that he had a lower bunk pass, and whether staff breached their duty by failing to assign Gregory to a lower bunk in the SHU.

In order to meet the third and fourth elements to establish a prima facie case of negligence, Gregory must establish a causal connection between the alleged breach and any resulting injuries. Under Pennsylvania law, a plaintiff is required to show that the defendant's negligence was the proximate cause of his injury by a preponderance of the evidence. Baum v. United States, 541 F.Supp. 1349, 1351 (M.D. Pa. 1982).[3] The United States asserts that Gregory cannot establish a causal connection between the alleged breach and any resulting injuries and, moreover, there is no evidence that Gregory fell from his top bunk due to a seizure. (Doc. 19 at 10-14). When Gregory presented to the medical department immediately after the fall, he reported to Pfirman and the health services staff that he "got up to urinate" and the next thing he remembered was "lying o[n] the floor in pain." (Pfirman Decl. at ¶ 6; Doc. 20-1 at 25). There is no direct reference to a seizure in the January 21, 2015 BOP clinical note, though the emergency room test reports indicate a history of seizures and a fall. (Doc. 20-1 at 25-27). In the complaint, Gregory alleges that on January 21, 2015, he suffered a seizure in his sleep, and "during his contortions" fell out of his top bunk. (Doc. 1 at 7). He further clarifies that, "I did

---

[3] Pennsylvania law defines proximate cause as causation which was a substantial factor in bringing about the injury. Hamil v. Bashline, 392 A.2d 1280, 1284 (Pa. 1978).

get up to urinate on 1/21/15 at around 4 am then had a seizure and fell on the floor." (Doc. 27 at 1, ¶¶ 19-22). Based on the record, clearly there is a question of material fact as to the cause of Gregory's alleged fall, and whether the prison staff's purported negligence was the proximate cause of his injuries.

Regarding the fourth element, the parties dispute whether Gregory suffered any injuries from his January 21, 2015 fall. The medical tests performed immediately after the alleged fall were primarily within normal limits. (Doc. 20-1 at 29-38). However, subsequent tests reveal abnormalities and injuries. In April 2015, Gregory presented to the medical department with complaints of persistent pain since his fall in January of that year. (Doc. 27 at 4). In June and July 2015, Gregory underwent additional testing due to "chronic pain." (Doc. 1 at 7-8). On June 22, 2015, Gregory underwent an MRI of the cervical spine due to "persistent pain." (Doc. 1 at 10). The MRI revealed a disc bulge at C4-C5, and C5-C6. (Id.) On July 7, 2015, an EMG was conducted based on Gregory's reports of pain from the low back to feet, burning in both feet, and tingling in the right hand. (Id. at 9). The EMG revealed mild right ulnar neuropathy across the elbow, mild right radial sensory neuropathy, no definitive evidence of acute lumbar radiculopathy, and no evidence of peripheral polyneuropathy. (Id.) The parties dispute whether the physical ailments detected in the June and July tests were caused by the fall on January 21, 2015. Based on the record, the court cannot determine whether the June and July 2015 medical visits and tests were directly related to Gregory's fall in January 2015.

There are genuine issues of material fact with respect to whether the FCI-Allenwood officials were negligent when they failed to assign Gregory to a lower bunk upon his transfer to the SHU, the cause of the alleged fall, and whether there is a causal connection between the alleged breach, i.e., the failure to assign Gregory to a lower bunk in the SHU, and any resulting injuries. Consequently, entry of summary judgment is precluded.

## IV.     Conclusion

Based on the foregoing, the United States' motion for summary judgment will be denied. An appropriate order will issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      February 13, 2017